UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                    )
ADAM HELFAND, CARON HELFAND,    )
AND MITCHELL HELFAND,                     )
                                                    )
            Plaintiffs,                              )
                                                    )
v.                                                   )            C.A. No. 04-11800-DPW
                                                    )
THE JOHN DEWEY ACADEMY, INC.,       )
THOMAS BRATTER, CAROLE               )
BRATTER, KEN STEINER, AND              )
GWENDOLYN HAMPTON,                    )
                                                    )
            Defendants.                           )
_____)

**MEMORANDUM IN SUPPORT OF JDA DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Defendants John Dewey Academy, Inc. ("JDA"), Thomas Bratter, ("Bratter"), Carole

Bratter and Ken Steiner ("Steiner"), (collectively, the "JDA Defendants") submit this

memorandum in support of their motion for summary judgment.  Plaintiffs have released the

JDA Defendants from all claims in this case.  Additionally, they have failed to establish a

genuine issue of material fact on their claims of  breach of contract, negligent misrepresentation,

and violation of G.L. c. 93A, and on Caron and Mitchell Helfand's claims for emotional distress

and loss of consortium.  The Court should grant summary judgment on all counts.

FACTUAL BACKGROUND

This case arises out of a sexual relationship between plaintiff Adam Helfand ("Helfand"

or "Adam"), a former student at JDA, and defendant Gwendolyn Hampton, a JDA faculty

member ("Hampton").  The relationship began in November 2000, when Helfand was 18½ years

old (Ex. 1, G. Hampton Dep. at 372) and continued beyond his senior year and for his first two years of college.  (Ex. 2, A. Helfand Dep. at 67).[1]

Helfand was born on March 10, 1982 to Caron and Mitchell Helfand of North Brookfield, Illinois.  (Ex. 3, C. Helfand Dep. at 6-7).  Throughout his adolescence, Helfand exhibited serious behavioral problems.  In junior high school, he began smoking marijuana, and was caught shoplifting cigarettes and condoms from a drug store.  (Ex. 2, A. Helfand Dep. at 101, 474-75; Ex. 3, C. Helfand Dep. at 15).   In high school he began dealing drugs, destroyed property, assaulted a student, and stole a purse containing $140, using the money to buy drugs.  (Ex. 2, A. Helfand Dep. at 102, 109-111, 511, 529-530).  On June 4, 1999, he was expelled from Glenbrook North High School in Northbrook, Illinois after drug paraphernalia and marijuana residue were found in his car.  (Ex. 3, C. Helfand Dep. at 84-85).

On June 10, 1999, Adam Helfand enrolled at John Dewey Academy.  (Ex. 4, "Pre-Enrollment/Enrollment and Financial Agreement" ("Enrollment Agreement")).  On that date, Mitchell Helfand, on behalf of himself and Adam Helfand, signed a document entitled "RELEASE" that releases The John Dewey Academy from any claims arising out of Helfand's attendance at JDA.  (Ex. 5, Release).  Also on June 10, 1999, Mitchell Helfand signed an Enrollment Agreement with JDA, which states: "I/We acknowledge that there is no twenty-four-hour, seven-day-a-week supervision at the school."  (Ex. 4, Enrollment Agreement).

Helfand began attending JDA in June 1999.  (Ex. 3, C. Helfand Dep. at 122).  Hampton taught Spanish and supervised the school's kitchen.  (Ex. 1, G. Hampton Dep. at 74-75).  In November 1999, the school assigned defendant Hampton as Helfand's "primary clinician." (Amended Complaint ("Complaint"), ¶ 14).  During the period from November of 2000 until Helfand graduated in the summer of 2001, he and Hampton repeatedly had sexual intercourse at

_____

[1] "Ex. __" refers to the exhibits attached to the Affidavit of Joseph D. Steinfield, filed herewith.

her home in Great Barrington, Massachusetts. (Ex. 2, A. Helfand Dep. at 327-328). Neither Hampton nor Helfand told any students or staff at JDA about their relationship. (Id. at 75, 185-86). Both of them knew that severe punishment – expulsion for Helfand, firing for Hampton – would occur if their illicit affair were discovered. (Ex. 1, G. Hampton Dep. at 596; Ex. 2, A. Helfand Dep. at 169-170). Thus, they took great pains to maintain secrecy and to mislead and deceive those who trusted them. (Ex. 2, A. Helfand Dep. at 75-77, 171-172, 185-186, 399-400).

Helfand graduated from John Dewey Academy in August 2001 and enrolled at Manhattanville College in New York. He and Hampton continued their relationship during his freshman and sophomore years at college, (Ex. 2, A. Helfand Dep. at 67), still concealing it from JDA and from Helfand's family. In September 2001, Helfand and Hampton conceived a child. (Id. at 66). In June 2002, the child, Vanessa, was born. (Ex. 1, G. Hampton Dep. at 44-45). Helfand and Hampton placed her with an adoption agency. (Id. at 664-666). Helfand resumed having sexual intercourse with Hampton shortly after the child was born. (Ex. 2, A. Helfand Dep. at 202; Ex. 1, G. Hampton Dep. at 451-452). In the summer of 2002, Hampton became pregnant once again. (Ex. 2, A. Helfand Dep. at 380-381). Helfand took her to a medical facility where she had an abortion. (Id.; Ex. 1, G. Hampton Dep. at 452). All the while, the two clandestine lovers kept their affair, and Hampton's pregnancies, a closely guarded secret. (Ex. 1, G. Hampton Dep. at 274-278; Ex. 2, A. Helfand Dep. at 185-186).

Helfand finished his freshman year of college in June of 2002. In July he went to California to visit his aunt, Holly Anderson. (Ex. 6, H. Anderson Dep. at 29-30). During that visit he told his aunt about him and Gwen – the sex, the birth, and the adoption. (Id. at 50-51). He swore his aunt to secrecy, and she agreed. (Id. at 60-61). However, in January 2003, Anderson called Caron and Mitchell Helfand on the telephone at their home in Illinois and told

3

them what Adam had disclosed some six months earlier.  (Ex. 3, C. Helfand Dep. at 137-138; 141-142; Ex. 6, H. Anderson Dep. at 72-77, 79-80).  If Anderson had not kept her six-month oath of silence, or if the parents had taken some sort of immediate action following Anderson's phone call, another pregnancy might have been avoided.

Instead, Anderson said nothing to Adam of her call, nor did the parents, who chose, apparently, to wait for some more convenient time.  (Ex. 6, H. Anderson Dep. at 74-75; Ex. 3, C. Helfand Dep. at 213).  Adam and Hampton went on having sex, and in March the parents took a trip to California.  (Ex. 1, G. Hampton Dep. at 691-692; Ex. 3, C. Helfand Dep. at 213).  Adam joined them there, and the whole matter (or at least the major points) came out in the open.  (Ex. 7, M. Helfand Dep. at 95-96).  Thereafter, the family agreed that Adam should cease all contact with Hampton, and he did.  (Ex. 1, G. Hampton Dep. at 691-692; Ex. 8, E-mail).  On September 17, 2003, Hampton gave birth to Maya Fay Hampton Helfand.  (Ex. 1, G. Hampton Dep. at 44).  According to Hampton, Adam is the child's father.  (Id. at 47).

On August 17, 2004, plaintiffs brought this case against five defendants:  John Dewey Academy; three of its employees – Thomas Bratter, the founder and headmaster; Kenneth Steiner, dean; and Carole Bratter, vice president and business manager – and against Gwendolyn Hampton, a former employee.  This motion is filed on behalf of all defendants except Hampton.

The complaint pleads ten counts, as follows.

| Count | Plaintiff(s) | Defendant(s) | Cause of Action |
|---|---|---|---|
| I | All Plaintiffs | JDA | Negligent Hiring |
| II | All Plaintiffs | JDA<br>Thomas Bratter<br>Kenneth Steiner | Negligent Supervision (of Hampton) |

| III | All Plaintiffs | JDA<br>Thomas Bratter<br>Kenneth Steiner<br>Carole Bratter | Negligent Supervision (of Helfand) |
|---|---|---|---|
| IV | Adam Helfand | Gwendolyn Hampton | Counseling Malpractice |
| V | Adam Helfand | JDA | Respondeat Superior |
| VI | All Plaintiffs | JDA | Breach of Contract |
| VII | All Plaintiffs | JDA | G.L. c. 93A |
| VIII | All Plaintiffs | Thomas Bratter | Negligent Misrepresentation |
| IX | Adam Helfand | Gwendolyn Hampton | Negligent Infliction of Emotional Distress |
| X | Mitchell Helfand<br>Caron Helfand | JDA<br>Thomas Bratter<br>Kenneth Steiner<br>Carole Bratter<br>Gwendolyn Hampton | Loss of Consortium |

## ARGUMENT

## I.   PLAINTIFFS HAVE RELEASED THE JDA DEFENDANTS FROM LIABILITY.

On June 10, 1999, Mitchell Helfand signed a document on behalf of himself and Adam

Helfand, unequivocally releasing the JDA defendants of all liability arising out of Adam's

attendance at John Dewey Academy.  (Ex. 5, Release).  In relevant part, it states:

> In consideration of the student, Adam Helfand, being admitted to The John Dewey Academy (the 'Academy'), in Great Barrington, Massachusetts, the undersigned, the Parent and/or Guardian to the Student, hereby releases the Academy, and all its agents, officers, and employees, from any and all liability or responsibility for any and all injury or other causes of action of every nature arising out of the undersigned's attendance at the Academy, and from any and all injury of causes of action of every nature sustained or arising while the undersigned is on or about the premises.

> Further, the undersigned recognizes, understands and agrees that it is not possible to supervise the activities of the Student 24 hours a day and there may be times

when the Student is therefore unsupervised or off campus without the knowledge of the Academy. . . .

It is expressly understood that without executing this Release, the Academy would not accept the Student into the programs, courses, sessions or seminars as the case may be, or if already accepted, the Student would not be continued in enrollment past the end of the current semester.  (emphasis supplied)

It is understood that 'the undersigned in the singular as used throughout this RELEASE refers to all parties executing the RELEASE, whether singular or plural, masculine or feminine, and if minors are involved, the undersigned is signing in both his individual capacity and that of custodian and guardian of such minors.  (Id.).

All of the claims in this case "aris[e] out of [Helfand's] attendance at the Academy," and are subject to the Release.  (Id)  Plaintiffs' complaint, at its core, alleges that JDA negligently hired Hampton and negligently supervised Hampton and Helfand, resulting in an inappropriate relationship and emotional distress.  (Complaint, ¶ 1).  Accordingly, there is no genuine issue of material fact for trial, and summary judgment should enter on behalf of the JDA defendants.

Releases of liability for future harm are enforceable in Massachusetts.  "There can be no doubt . . . that under the law of Massachusetts . . . in the absence of fraud a person may make a valid contract exempting himself from any liability to another which he may in the future incur as a result of his negligence or that of his agents or employees acting on his behalf."  Sharon v. City of Newton, 437 Mass. 99, 105 (2002), quoting Schell v. Ford, 270 F.2d 384, 386 (1st Cir. 1959).  "Whether such contracts be called releases, covenants not to sue, or indemnification agreements, they represent 'a practice our courts have long found acceptable.'"  Id., quoting Minassian v. Ogden Suffolk Downs, Inc., 400 Mass. 490, 492 (1987) (holding that a release required as a condition of voluntary participation is enforceable).

It is equally well-settled that a parent may contract away a minor child's right to sue for future harm.  In Sharon v. City of Newton, 437 Mass. 99, 108-109 (2002), the father of a minor

signed a release to allow her to participate in a school cheerleading program, and the minor was injured during practice. The SJC held that the release did not violate public policy, and that the minor could not disavow it once she reached the age of majority. Id. at 106-108. Although the court noted in dicta that such releases might not be enforceable as a condition of attending a *public* school, it made no such suggestion with respect to a private school. Id. at 106 ("We have not had occasion to rule on the validity of releases required in the context of a compelled activity or as a condition for the receipt of essential services (e.g. *public* education, medical attention. . . .")) (emphasis supplied). See also Vokes v. Ski Ward, Inc., No. 03-2313B, 2005 Mass. Super LEXIS 346 (Mass. Super. Ct., July 5, 2005) (upholding father's release of minor's claims against ski school); Hohe v. San Diego Unified Sch. Dist., 224 Cal. App. 3d 1559, 1565 (Cal. Ct. App. 1990) (holding that parent may execute release on behalf of child).

Finally, the release is clear and unambiguous, and therefore enforceable according to its terms. Mitchell Helfand signed the release "in both his individual capacity and that of custodian and guardian" of Adam Helfand, and it broadly releases John Dewey Academy and its agents, officers and employees from any liability arising out of Adam Helfand's attendance at JDA. (Ex. 5, Release). Mitchell Helfand admits that he read the document and understood that he was releasing JDA from any liability arising out of Adam Helfand's attendance.

Q.  What did you understand you were signing?

A.  It was a document that would acknowledge the fact that I understood the terms of his admission to John Dewey.

Q.  And specifically, you agreed that John Dewey Academy would be released from all liability or responsibility for anything that happened while Adam was there, didn't you?

MR. HARDOON:  Objection.

Q.  Just read that first paragraph to yourself.

A.   That's what it says.

Q.   And at the time you signed the document, you knew that that is what it said; right?

A.   I read it, yes.

(Ex. 7, M. Helfand Dep. at 54-55).

The release bars all of the claims in this case.  Summary judgment should therefore enter on behalf of the JDA Defendants on all counts of the complaint.  However, even if the release somehow did not dispose of this case, plaintiffs have otherwise failed to establish a genuine issue of material fact on many of the claims alleged in the Complaint, which we will address below.

## II.    PLAINTIFFS CANNOT RECOVER FOR BREACH OF CONTRACT.

In Count VI, plaintiffs contend that JDA broke contractual promises with Caron and Mitchell Helfand of which Adam was a third-party beneficiary.  (Complaint, ¶ 37).  Plaintiffs cannot recover under this theory for two reasons:  First, none of the alleged "promises" was sufficiently concrete or definite to amount to an enforceable contract; and second, plaintiffs signed specific written documents that made any reliance on such oral "promises" unreasonable.[2]

In their answers to interrogatories, plaintiffs contend that JDA breached certain "promises" made in "enrollment contracts," "promotional materials," and "correspondence." (Ex. 9, C. Helfand's Answers to Ints at 3; Ex. 10, M. Helfand's Answers to Ints at 3).  However,

---

[2] Courts have been reluctant to apply ordinary contract law to contracts for educational services.  See Lyons v. Salve Regina College, 565 F.2d 200, 201 (1st Cir. 1977).  Although "some elements of the law of contracts are used and should be used in the analysis of the relationship between plaintiff and the university to provide some framework into which to put the problem," courts recognize that "the student-university relationship is unique, and it should not be and can not be stuffed into one doctrinal category. . . ." Id., quoting Slaughter v. Brigham Young University, 514 F.2d 622, 626 (10th Cir. 1975).  This reluctance to apply strict contract law to educational institutions also applies to private secondary schools.  Gorman v. St. Raphael Academy, 853 A.2d 28 (R.I. 2004) (holding, in claim against private school, that courts must construe contracts for private education "in a manner that leaves the school administration broad discretion to meet its educational and doctrinal responsibilities"); Jones v. Howe Military School, 604 F.Supp. 122, 125 (N.D. Ind. 1984) (same).  Although plaintiffs' contract claims fail even under ordinary Massachusetts contract law, these cases provide further reason to find the "promises" at issue unenforceable.

they do not explain what "promises" in these materials were allegedly broken.  Instead, they rely

in their interrogatory answers on the following oral statements by JDA staff:

1.    that "JDA staff told Caron and Mitchell Helfand that JDA was taking good care of their son;"

2.    that JDA staff told Helfand's parents "that their son would leave JDA with the self-respect and confidence to be a 'moral leader.'"

3.    that Thomas Bratter "promised Caron Helfand and Mitchell Helfand that the structure of JDA, in which students and staff were required to hold each other accountable for their actions through direct confrontation and consequences, would bring to light any acts that violated JDA's code of behavior."

4.    that Bratter told the Helfands "that JDA was a therapeutic school with highly qualified staff."  (Id.)

These alleged promises are too vague and generic to form a contract under Massachusetts

law.  A statement contained in school promotional materials or handbooks can support a claim

for breach of contract only if (1) the statement is "'definite and certain so that the promisor

should reasonably foresee that it will induce reliance,'" and (2) and "reliance occurs."

Guckensberger v. Boston University, 974 F.Supp. 106, 150 (D. Mass. 1997), quoting Santoni v.

Fed. Deposit Ins. Corp., 677 F.2d 174, 179 (1st Cir. 1982); see also Armstrong v. Rohm & Haas

Co., 349 F. Supp. 2d 71, 78 (D. Mass. 2004) ("In order to create an enforceable contract, 'it is a

necessary requirement that the agreement be sufficiently definite to enable the courts to give it an

exact meaning,'"), quoting Williston on Contracts § 4:18 (4th ed. 1990)).  Although specific,

concrete promises of a school administrator may be enforceable, "generalized representations"

concerning the treatment and care of students are not sufficient to establish a contract.  Compare

Guckensberger v. Boston University, 974 F.Supp. 106, 151-52 (D. Mass. 1997) (holding that

learning-disabled student stated contract claim where university promised her a course

substitution in place of university's foreign language requirement, but then required her to take

Swahili) <u>with</u> <u>Morris v. Brandeis Univ.</u>, 60 Mass. App. Ct. 1119, n.6 (2004) (unpublished opinion, attached hereto as Exhibit A) (holding that university's promise in promotional materials to treat students with "fairness and beneficence" was "too vague and indefinite to form an enforceable contract"); <u>see also</u> <u>Ullmo v. Gilmour Academy</u>, 273 F.3d 671, 676-677 (6th Cir. 2001) (holding that "a general statement of [a school's] ideals" set forth in student handbook amounted to "indefinite and aspirational language," and not an enforceable promise).

The case of <u>Shin v. Massachusetts Institute of Technology</u>, 19 Mass. L. Rep. 570 (Mass. Super. Ct., June 27, 2005), provides strong support.  In that case, parents alleged breach of contract arising out of a university's allegedly inadequate counseling of their daughter, resulting in her suicide.  The MIT medical department's brochure stated that it would provide "access to a full range of physicians and other health care professionals who can care for your physical and psychological needs."  <u>Shin</u>, 19 Mass. L. Rep. at 574**.**  The department's by-laws also stated that it "has the responsibility to provide high quality, low barrier comprehensive health services" to university students.  <u>Id</u>.  The Court held on summary judgment that these statements amounted to mere "generalized representations," not specific promises that could form a contract.  <u>Id.</u>

Like the alleged promises in <u>Shin</u>, none of the statements on which plaintiffs rely is sufficiently definite to form a contract.  The alleged "promise" that Helfand would graduate with "the self-respect and confidence to be a 'moral leader'" is a mere "generalized representation" of the goals of the school, not a specific, enforceable promise on which a reasonable person could rely.  <u>Morris</u>, 60 Mass. App. Ct. 1119, n.6 (Exhibit A); Exs. 9 and 10 at 3.  The statement that JDA is "a therapeutic school with a highly qualified staff" is another such generalization, not unlike the promise in <u>Shin</u> to provide "high quality, low barrier comprehensive health services." <u>Shin</u>, 19 Mass. L. Rep. at 574.  The purported representation by JDA staff that they were taking

10

"good care" of Helfand – apparently made after Helfand enrolled – is also not a specific promise, nor is it a statement that plaintiffs could have relied upon in enrolling Helfand at JDA.

Finally, plaintiffs base their contract claim on the alleged representation that the "structure" of accountability at JDA would "bring to light any acts that violated JDA's code of behavior."  Apart from being another "generalized representation," <u>Morris,</u> 60 Mass. App. Ct. 1119, n.6, the claim fails for another reason:  it would simply have been unreasonable for Caron and Mitchell Helfand to believe that any violation by Helfand of the school's rules would necessarily be discovered, since the Enrollment Agreement made clear that JDA did not provide round-the-clock supervision.[3]  (Ex. 4).  Indeed, plaintiffs admit that they knew upon enrolling Helfand at JDA that he would not be "under lock and key."[4]  (Ex. 7, M. Helfand Dep. at 40).  Plaintiffs cannot establish a breach of contract.

## III.    PLAINTIFFS HAVE NO CLAIM FOR "NEGLIGENT MISREPRESENTATION."

"A defendant is liable for negligent misrepresentation if in the course of his business, he supplies false information for the guidance of others in their business transactions, causing and resulting in pecuniary loss to others by their justifiable reliance on the information, with failure

---

[3] To the extent plaintiffs rely on generic representations concerning student "safety" in JDA promotional materials, the Enrollment Agreement makes any reliance on such statements unreasonable.

[4] Indeed, the parents were well aware of Adam's propensity for manipulative and deceptive behavior. Adam's conduct while still living at home was so out of control that the parents repeatedly bribed him to behave (Ex. 3, C. Helfand Dep. at 23-25, 29-30, 91-92).  His mother armed him with a pager so that she could keep track of him (Id. at 42-43); Adam used the pager to help him sell drugs at and around his high school (Ex. 2, A. Helfand Dep. at 485; Ex. 3, C. Helfand Dep. at 42-43).  His mother was so frantic and distrustful that she used to follow her son (Ex. 3, C. Helfand Dep. at 55).  Helfand stated that once they started to bribe him "I knew I controlled them."  (Ex. 2, A. Helfand Dep. at  477).  And starting years before JDA, he was a virtual one-person crime wave.  He stole money from his parents and from his friends' houses to buy drugs, (a fact that Caron Helfand did not know until her deposition in this case (Ex. 3, C. Helfand Dep. at 54-55)).  He shoplifted repeatedly starting in the seventh grade, and his parents knew about one shoplifting episode in which he was caught.  (Ex. 3, C. Helfand Dep. at 37-38).  He "keyed" a car (his mother paid for the repairs) (Ex. 2, A. Helfand Dep. at 473-474; Ex. 3, C. Helfand Dep. at 16-17), beat up students more or less regularly, (Ex. 2, A. Helfand Dep. at 110), and was in constant hot water with teachers and school officials due to his complete indifference to the rights of others and rules of any kind.  (Ex. 11, List of School Infractions).

to exercise reasonable care or competence in obtaining or communicating the information."

Marram v. Kobrick Offshore Fund, Inc., 442 Mass. 43, 60 (2004).  To form the basis of a

negligent misrepresentation claim, a statement of "false information" must be "not merely a

matter of opinion, estimate, or judgment," but rather must be "susceptible of actual knowledge."

Powell v. Rasmussen, 355 Mass. 117, 118 (1969).

Plaintiffs have not established a genuine issue of material fact as to any false statement

made by Bratter that is "susceptible of actual knowledge."  Id.  The only alleged Bratter

statements set forth in plaintiffs' answers to interrogatories are that "the structure of JDA, in

which students and staff were required to hold each other accountable for their actions through

direct confrontation and consequences, would bring to light any acts that violated JDA's code of

behavior;" and that "JDA was a therapeutic school with highly qualified staff."  (Ex. 10, M.

Helfand's Answers to Ints at 3 (responding to interrogatory regarding contract claim)).  These

statements are plainly insufficient to support a misrepresentation cause of action because they are

matters of "opinion, estimate, or judgment," not statements of fact that are "susceptible of actual

knowledge."  Powell, 355 Mass. at 118.

## IV.    PLAINTIFFS HAVE NO CLAIM UNDER G.L. c. 93A.

Plaintiffs cannot maintain a cause of action under G.L. c. 93A because their complaint

sounds in negligence and they have not established a genuine issue of material fact as to any

"unfair or deceptive act or practice."  G.L. c. 93A § 2.  "[V]iolation of G. L. c. 93A requires, at

the very least, more than a finding of mere negligence."  Darviris v. Petros, 442 Mass. 274, 278

(2004).  See Meyer v. Wagner, 429 Mass. 410, 424 (1999) (holding that client's G. L. c. 93A

claims against attorney did not suggest any unfair or deceptive acts, "but instead sounded in

negligence"); Squeri v. McCarrick, 32 Mass. App. Ct. 203, 207 (1992) (holding that a "negligent

act standing by itself does not give rise to a claim under c. 93A.  There must in addition be evidence that the negligence was or resulted in an unfair or deceptive act or practice.")

In determining whether a complaint involves an "unfair or deceptive act or practice" as opposed to mere negligence, courts focus on whether there is some "entrepreneurial or business aspect" to the cause of action.  Darviris, 442 Mass. at 280 (2004).  For example, in Darviris, the Supreme Judicial Court upheld summary judgment on a c. 93A claim based on a physician's alleged failure to obtain informed consent.  "The purpose of G.L. c. 93A," the court held, "is to improve the commercial relationship between consumers and business persons and to encourage more equitable behavior in the marketplace."  Id. at 278.  (emphasis supplied)  "[A] claim for the negligent delivery of medical care, without more, does not qualify for redress" under c. 93A, particularly where there is "nothing in the record to suggest that any negligence . . . even if proved, concerns any entrepreneurial or business aspect of his medical practice."  Id. at 278, 280.

Similarly, in Shin v. Massachusetts Institute of Technology, 19 Mass. L. Rep. 570 (2005), plaintiffs brought a c. 93A claim based on the negligent delivery of psychological services to their daughter.  The Court granted summary judgment, holding that that the claim amounted to "an alleged failure by MIT Medical Professionals to adequately coordinate and provide proper medical health care," a claim that "fails to concern any 'entrepreneurial or business aspect' of the MIT Medical Professionals' medical practice."  Shin, 19 Mass. L. Rep. at 574-75.

So here, plaintiffs' claim does not concern any "entrepreneurial or business aspect" of JDA.  Darviris, 442 Mass. at 278.  Plaintiffs' claim, at its core, is that JDA's  failure to supervise Helfand and Hampton resulted in their inappropriate sexual relationship.  Like Shin and Darviris, plaintiffs' complaint sounds in negligence, and does not present a triable c. 93A claim.

Nor can plaintiffs establish that defendant Thomas Bratter committed a "deceptive" act by failing to disclose that he had pleaded *nolo contendere* in 1993 to a charge of "unlawful physical restraint" involving a JDA student.  (Ex. 12, T. Bratter Dep. at 9).  A plaintiff in a c. 93A case can only recover for a defendant's failure to disclose a fact if (1) the defendant knew of the fact at issue, (2) the fact was a "material circumstance" which would have led the plaintiffs to act differently, and (3) the defendant failed to disclose the fact.  See Sheehy v. Lipton Industries, 24 Mass. App. Ct. 188, 195 (1987).  Additionally, as with any c. 93A claim, the plaintiff must prove "a causal connection between the deception and the loss and that the loss was foreseeable as a result of the deception."  International Fidelity Ins. Co. v. Wilson, 387 Mass. 841, 850 (1983), citing Kohl v. Silver Lake Motors, Inc., 369 Mass. 795, 800-801 (1976).  Plaintiffs have not produced any evidence tending to show that they would not have enrolled Helfand at JDA had they known of the prior Bratter incident.  Kohl, 360 Mass. at 801.

However, even if plaintiffs could establish that Bratter's past was a "material circumstance" when they enrolled Adam in JDA, they cannot establish any "causal connection" between the nondisclosure and the loss, or that "the loss was foreseeable" as a result of Bratter's silence.  International Fidelity, 387 Mass. at 850, citing Kohl, 369 Mass. at 800-801 (holding that "[a] seller who violates G.L. c. 93A, § 2, is not thereby a guarantor against defects in the item sold which are unrelated to the deceptive act or practice.")  To meet the "causal connection" requirement, the injury must have "directly resulted" from the "deceptive" act or practice.  Cummings v. HPG Int'l, Inc., 244 F.3d 16, 26-27 (1st Cir. 2001).  Bratter's failure to disclose the unrelated issue of his own legal encounter past cannot be said to have "directly resulted" in Helfand's relationship with Hampton.  Moreover, "[o]nly those losses sustained by the buyer

which were the *foreseeable* consequence of the seller's deception" are recoverable.  Kohl, 369

Mass. at 800 (emphasis in original).  The c. 93A claim falls short under that standard as well.

IV.    **CARON AND MITCHELL HELFAND HAVE NO CLAIM FOR EMOTIONAL
       DISTRESS DAMAGES OR FOR LOSS OF CONSORTIUM.**

       Plaintiffs Caron and Mitchell Helfand cannot recover emotional distress damages under

any of their causes of action, nor can they establish a claim of loss of consortium, as alleged in

Count X of the complaint.  The law of Illinois, which applies to these claims, does not recognize

a cause of action for loss of filial society arising out of nonfatal injuries to a child.  Vitro v.

Mihelcic, 209 Ill. 2d 76, 90-91 (2004); Dralle v. Ruder, 124 Ill.2d 61 (1988).  Additionally,

plaintiffs cannot recover for emotional distress based on harm to their son because they were

never in the "zone of danger" of the allegedly tortious conduct.

A.    **Illinois Law Applies to the Parents' Claims for Emotional Distress Damages and
      Loss of Consortium.**

       Under Massachusetts choice of law principles,[5] the law of Illinois applies to the parents'

claims for emotional distress damages and for loss of consortium.  The Supreme Judicial Court

has held that where a parent asserts emotional distress or loss of consortium based on injury to a

child, courts must apply the substantive law of the state where the parent's alleged injury

occurred, not that of the location of the allegedly tortious conduct.  Cohen v. McDonnell Douglas

Corp., 389 Mass. 327, 335 (1983).

       In Cohen, a Massachusetts resident received a telephone call in Massachusetts informing

her that her son had died in a plane crash near Chicago, Illinois.  Cohen, 389 Mass. at 329-330.

The mother thereafter suffered a heart attack and died.  The Supreme Judicial Court considered

---

[5] A federal court sitting in diversity is required to apply the substantive law of the forum state, including
its choice of law rules.  Klaxon v. Stenton Elec. Co., Inc., 313 U.S. 487 (1941); Restoration Pres.
Masonry Inc. v. Grove Eur. Ltd., 325 F.3d 54, 63 (1st Cir. 2003)("In diversity cases, we apply the forum
state's choice of law rules.").

whether Massachusetts or Illinois law applied to the estate's claims for emotional distress.  The

Court noted that in Massachusetts, the law governing a tort action is generally the law of the

place where the injury occurred.  Brogie v. Vogel, 348 Mass. 619, 621 (1965).  The place where

an injury occurs is the place "where the last event necessary to make an actor liable for an

alleged tort takes place."  Cohen, 389 Mass. at 334, quoting Orr v. Sasseman, 239 F.2d 182, 186

(5th Cir. 1956).  The court rejected the defendants' argument that the "place of injury" was

Illinois, where the airplane crash occurred.  Instead, it held that the "last event necessary" to

make defendant liable took place where the mother "learned of the injury to her son and suffered

severe emotional distress herself."  Cohen, 389 Mass. at 335.  Moreover, no other state had a

more significant interest in the plaintiff's claim than Massachusetts, the state in which the mother

resided.  Cohen, 389 Mass. at 336-337; citing Restatement 2d Conflict of Laws § 146, comment

e (stating that in cases where tortious conduct occurred in one State and injury occurred in

another, "the local law of the state of injury will usually be applied. . . .").  Accordingly, the

Court held, Massachusetts law applied, not the law of Illinois.

    In this case, the geography is reversed but the result is the same.  It is undisputed that

plaintiffs Caron and Mitchell Helfand learned of their son's sexual relationship with Hampton by

means of a 2003 telephone call from Mitchell's sister in California to the Helfands in Illinois.

(Ex. 3, C. Helfand Dep., 137-138; 141-142; Ex. 6, H. Anderson Dep., 72-77).  Caron and

Mitchell Helfand have resided in Illinois at all times, and have accordingly suffered any

emotional distress in Illinois.  (Ex. 3, C. Helfand Dep. at 6; Ex. 7, M. Helfand Dep. at 4).  There

is nothing in the record to suggest that Massachusetts has any interest in the matter, much less a

greater interest in these Illinois plaintiffs' claims than does their home State of Illinois.  Cohen,

389 Mass. at 335.  Accordingly, Illinois law applies to plaintiffs' claims for emotional distress.

Illinois law also governs the parents' claim for "Loss of Consortium" in Count X of the Complaint.  In <u>Cohen</u>, the SJC suggested that in consortium cases involving a husband and wife, it would apply the law of the state in which the plaintiff's domicil is located, not of the state in which the tortious conduct took place.  <u>Cohen</u>, 389 Mass. at 335 n. 8.  "[A] claim for loss of consortium is independent of the claim of the injured spouse."  <u>Id.</u>, <u>citing</u> <u>Feltch v. General Rental Co.</u>, 383 Mass. 603, 606-608 (1981).  Thus, absent a countervailing interest by another state, the law of the place of injury – in this case, Illinois – applies.  <u>Id.</u>

**B.      Caron and Mitchell Helfand Cannot Recover Emotional Distress Damages Because they Were Not in the "Zone of Danger."**

Under Illinois law, a plaintiff cannot recover for emotional distress arising out of harm to a third person unless the plaintiff was within the "zone of physical danger" at the time of the injury, and suffered physical injury or illness as a result of the emotional distress.  <u>Rickey v. Chicago Transit Auth.</u>, 98 Ill.2d 546, 555 (1983).  In this case, Caron and Mitchell Helfand cannot establish a genuine issue of material fact on either of these elements.[6]  Accordingly, they cannot recover emotional distress damages under any cause of action.

In <u>Rickey</u>, 98 Ill. 2d at 555, the Supreme Court of Illinois set forth the standards under which a plaintiff may recover for emotional distress arising out of harm to a third person.  The

---

[6] Although Illinois law clearly applies in this case, the result would be the same under Massachusetts law. Under well-established Massachusetts law, a parent cannot recover for emotional distress caused by harm to a son or daughter unless there is both "spatial and temporal proximity" to the scene of the injury. <u>Krasnecky v. Meffen</u>, 56 Mass. App. Ct. 418, 423 (2002).  Parents may only recover for emotional distress caused by witnessing injury to a child where "the shock follows closely on the heels of the accident." <u>Ferriter v. Daniel O'Connell's Sons, Inc.</u>, 381 Mass. 507, 518 (1980).  In <u>Stockdale v. Bird & Son</u>, 399 Mass. 249, 252 (1987), the court denied recovery where a mother did not learn of the death of her son for "several hours."  In this case, alleged "injuries" from the improper relationship occurred between November 1999 and June 2002.  Caron and Mitchell Helfand did not learn of them until January 2003.  At all relevant times, Helfand's parents were hundreds of miles away from Helfand and Hampton, in Chicago.  Moreover, Caron and Mitchell Helfand were not present at the scene of the alleged injuries – like the plaintiff in <u>Cohen</u>, they learned about them over the telephone.  <u>Cohen</u>, 389 Mass. at 342.  Accordingly, Caron and Mitchell Helfand fail the "spatial and temporal proximity" requirements of emotional distress caselaw in Massachusetts.  <u>Kraznecky</u>, 56 Mass. App. Ct. at 423.

plaintiff, an eight-year-old child, was riding with his younger brother on an escalator when the brother's clothing became entangled in the machinery, resulting in serious injury.  The plaintiff sued for emotional distress he suffered as a result of viewing the accident.  The court adopted the "zone-of-physical-danger rule," which holds that "a bystander who is in a zone of physical danger and who, because of the defendant's negligence, has reasonable fear for his own safety is given a right of action for physical injury or illness resulting from emotional distress."  Rickey, 98 Ill.2d at 555.  The court allowed the plaintiff to amend his complaint to allege that "he had a reasonable fear for his own safety, causing emotional distress."  Id. at 556.

Since the Rickey decision, courts in Illinois have dismissed numerous claims for emotional distress by plaintiffs who were not in the "zone of physical danger" at the time of injuries to a third party.  Marciela G. v. Sperlik, 2005 U.S. Dist LEXIS 31213 (N.D. Ill., Nov. 30, 2005) (holding that parents of students allegedly molested by teacher could not bring claim for emotional distress because they were not in the "zone of physical danger"); Calhoun v. Jumer, 292 Ill. App. 3d 817, 822 (Ill. App. Ct. 1997) (holding that plaintiff mother was not in "zone of physical danger" where her son was sexually abused by houseguest in the next room);  Villamil v. Elmhurst Mem. Hosp., 175 Ill. App. 3d 668, 672 (Ill. App. Ct. 1988) (mother was not in "zone of physical danger" where child fell off delivery table during childbirth); Sieminiec v. Lutheran General Hosp., 117 Ill. 2d 230, 260-62 (Ill. Ct. App. 1987) (parents were outside the "zone of danger" where allegedly negligent genetic counseling resulted in the birth of hemophiliac child).

In this case, Caron and Mitchell Helfand were not in any "zone of physical danger" at the time of the alleged injuries to their son.  Rather, they were hundreds of miles away in Illinois at all times while Helfand and Hampton were carrying on in Massachusetts and New York.

Caron and Mitchell Helfand's inability to recover emotional distress damages is fatal to many of their claims in this case. In their answers to interrogatories, they were asked to "itemize, by category, all damages" that they claim to have suffered as a result of the acts or omissions of the JDA Defendants. (Ex. 9, C. Helfand Answers to Ints at 11). Their answers stated that they had suffered (1) "contract damages and other costs associated with maintaining Adam's residence at JDA and travel costs to visit him while there," and (2) emotional distress damages, including Caron Helfand's "treatment for anxiety." (Ex. 9, C. Helfand's Answers to Ints at 11; Ex.10, M. Helfand's Answers to Ints at 12).[7] The failure of these plaintiffs' breach of contract claim is addressed in Section I, above. Their inability to recover emotional distress damages means that summary judgment should also enter against Caron and Mitchell Helfand on Count I (negligent hiring), Count II (negligent supervision of Hampton), Count III (negligent supervision of Helfand), Count VII (G.L. c. 93A (addressed on independent grounds in Section II, above)), and Count VIII (negligent misrepresentation (see Section III, above)). The parents' Loss of Consortium claim (Count X), is addressed below.

## C.    Caron and Mitchell Helfand Cannot Establish a Loss of Consortium Claim.

The courts of Illinois do not recognize a claim for loss of consortium arising out of a nonfatal injury to a child. Vitro v. Mihelcic, 209 Ill. 2d 76, 90-91 (2004); Dralle v. Ruder, 124 Ill.2d 61 (1988). In Dralle v. Ruder, the parents of a child born with birth defects brought a claim against the manufacturers of drugs the mother had taken while pregnant. The Supreme Court of Illinois rejected the parents' claim for loss of the child's companionship and society, noting that such claims would engender problems of proof and would present "the unseemly spectacle of parents disparaging the 'value' of their children or the degree of their affection for

---

[7] Mitchell Helfand has incurred no such costs (Ex. 7, M. Helfand Dep. at 35), and the extent of Caron's "treatment," it turns out, is a conversation with her gynecologist, who prescribed a sedative (Ex. 3, C. Helfand Dep. at 47-48, 160-161).

them in open court." <u>Dralle</u>, 124 Ill.2d at 71, <u>quoting</u> <u>Cockrum v. Baumgartner</u>, 95 Ill.2d 193,

202 (1983). Moreover, the court held that to recognize such claims "would threaten a

considerable enlargement of liability," potentially extending to "[g]randparents, siblings, and

friends suffering similar losses of society." <u>Id.</u> at 70. The Illinois legislature, not the courts,

should decide whether to create such a cause of action. <u>Dralle</u>, 124 Ill. 2d at 69. This ruling was

reaffirmed in <u>Vitro v. Mihelcic</u>, 209 Ill.2d 76 (2004).

Accordingly, because Adam Helfand suffered only "nonfatal" injuries (if any) in this

case, Count X of plaintiffs' complaint must be dismissed.

<u>CONCLUSION</u>

For the foregoing reasons, the Court should grant summary judgment on all claims

pursuant to the Release. Additionally, and in the alternative, it should hold that plaintiffs Caron

and Mitchell Helfand have failed to establish a genuine issue of material fact on any of their

claims, and grant summary judgment as to Count VI (breach of contract), Count VII (G.L. c.

93A), and Count VIII (negligent misrepresentation) as to all plaintiffs.

Respectfully submitted,

JOHN DEWEY ACADEMY, THOMAS
BRATTER CAROLE BRATTER, and
KENNETH STEINER

By their attorneys,

<u>/s/ Joseph D. Steinfield</u>
Joseph D. Steinfield, BBO #478680
William A. Worth, BBO #544086
Jeffrey J. Pyle, BBO #647438
Prince, Lobel, Glovsky & Tye LLP
100 Cambridge Street, Suite 2200
Boston, MA 02114
(617) 456-8000

I, Joseph D. Steinfield, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non registered participants on July 31, 2006.

/s/ Joseph D. Steinfield