1

Volume:  I

Pages:  1-156

Exhibits:  1-10

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 04-11800-DPW

- - - - - - - - - - - - - - - - - - x

ADAM HELFAND, CARON HELFAND and

MITCHELL HELFAND,

            Plaintiffs,

vs.

THE JOHN DEWEY ACADEMY, INC., THOMAS

BRATTER, CAROLE BRATTER, KEN STEINER

and GWENDOLYN HAMPTON,

            Defendants.

- - - - - - - - - - - - - - - - - - x

DEPOSITION OF CARON HELFAND

Monday, November 7, 2005

Prince Lobel Glovsky & Tye, LLP

585 Commercial Street

Boston, Massachusetts 02109

Commencing at 1:22 p.m.

Reporter:  Karen A. Morgan, CSR/RPR

Caron Helfand

6

1    you need to consult with your attorney, you just tell

2    me.

3        A.    Okay.

4        Q.    All right.  Back to your address.

5        A.    North Brookfield, Illinois 60062.

6        Q.    Let me ask you a few preliminary questions

7    about yourself.  Where are you from originally?

8        A.    Chicago.

9        Q.    And did you go to public schools or private

10   school?

11       A.    Public.

12       Q.    Did you go on to school after high school?

13       A.    Yes.  University of Illinois.

14       Q.    Did you graduate?

15       A.    Yes, I did.

16       Q.    In what year and what was your specialty or

17   your major?

18       A.    I graduated in 1974 in retailing.

19       Q.    You are married to Mitchell Helfand who is

20   here in the room; right?

21       A.    Yes, I am.

22       Q.    The date of your marriage?

23       A.    June 23, 1974.

24       Q.    Sounds like you graduated and got married in

7

1    the same period of a few weeks; right?

2          A.    Just about.  About a month.

3          Q.    Did you then work?

4          A.    Yes.

5          Q.    What did you do?

6          A.    I was in the executive training program at

7    Carson Perry Scott.

8          Q.    What kind of a company is that?

9          A.    It is retail stores.

10         Q.    Did you complete that program?

11         A.    Yes, I did.  It was a year program.  I

12   completed it.

13         Q.    Then what did you do?

14         A.    Then I worked at Sak's Fifth Avenue for about

15   five years, six years until I was pregnant with my

16   first son.

17         Q.    And your first son is named Brad; is that

18   right?

19         A.    Correct.

20         Q.    His date of birth?

21         A.    March 14, 1979.

22         Q.    And your second son is Adam.  His date of

23   birth?

24         A.    3/10/82.

Caron Helfand

15

1    didn't understand the choices he was making but, you

2    know, we still sat down as a family and talked it out

3    with him Mitch and I.  You know, he didn't run away

4    from home.  He came -- you know, he came back always.

5    He wasn't staying out at night or disappearing.

6         Q.    We will get into some of the specifics as we

7    go along.  Is it fair to say that his behavioral

8    problems got worse in junior high school?

9         A.    Yes.

10        Q.    Would you describe them, please?

11        A.    The individual incidents you're talking

12   about?

13        Q.    As much as you can recall.  I don't want --

14   I'm not going to put words in your mouth.  I want you

15   to tell me everything you can recall.

16        A.    Okay.

17        Q.    We will just do it sort of chronologically.

18        A.    He started playing with lighters a lot and I

19   used to have to search his pockets before he went to

20   school because I was afraid he would bring a lighter to

21   school.  He got caught shoplifting at an Osco Drug

22   store with his friend and I think they stole

23   cigarettes.

24        Q.    Is that the time he also stole condoms?

Caron Helfand

16

1    A.    Maybe, yeah.  That was the only time, yeah.

2    Q.    The only time what?

3    A.    That he was caught shoplifting.

4    Q.    You know he stole a great deal though, don't

5    you?

6    A.    I know he stole money from a girl in high

7    school.

8    Q.    Well, let's continue with the behavioral

9    issues that you can recall.

10    A.    He keyed a car.

11    Q.    He keyed a car?

12    A.    Mm-mm.

13    Q.    And that car belonged, did it, to someone

14    connected with his girlfriend Tiffany?

15    A.    Correct.

16    Q.    And he was angry, was he, Adam?

17    A.    Correct.

18    Q.    And he was angry because he thought this --

19    A.    I don't know why he did it.

20    Q.    Didn't he tell you that or didn't you learn

21    that he thought this young man was making fun of him?

22    A.    I don't recall.

23    Q.    And he scratched the car, did he?

24    A.    Yes.

Caron Helfand

17

1     Q.   And it cost $600 to paint it?

2     A.   I don't recall the exact amount.

3     Q.   You paid it?

4     A.   We did.

5     Q.   We or you?  In other words you personally or

6 you and your husband?

7     A.   My husband and I.

8     Q.   Now what discipline did you impose on Adam

9 for that particular event?

10    A.   I don't recall.  I mean I remember talking to

11 him in his room.  I knew something had happened and I

12 don't recall the punishment.

13    Q.   Do you recall whether he was punished for

14 that particular event?

15    A.   Oh, there was a punishment but I don't recall

16 what it was.

17    Q.   We are still in junior high school?

18    A.   Correct.

19    Q.   Tell me as much as you can recall, please, of

20 the behavioral issues or problems.

21    A.   He would get angry.  When he was really

22 angry, he would punch a hole in the wall sometimes.

23    Q.   Couldn't control his temper in other words?

24    A.   He would get angry and that would be his way

Caron Helfand

23

1    wasn't home.  He should have been home.

2        Q.    What other behavioral problems or issues can

3    you remember from those years?

4        A.    Just that.

5        Q.    Excuse me.  I'm trying to place the years.

6    We're talking, are we, about the mid nineties.  He was

7    13 in seventh grade; is that true?

8        A.    You know what?  I don't recall when the motor

9    bike was.  He was young.

10       Q.    He was born in March of '82.

11       A.    He was in junior high.  He was I believe

12   still in junior high.

13       Q.    So approximately '95, '96?

14       A.    Right.  Approximately.

15       Q.    What else do you recall from those years?

16       A.    There was a lot of negotiating with Adam.

17       Q.    What do you mean by that?

18       A.    If there was something that he didn't want to

19   do, we would have to sit and negotiate with him until

20   it worked out where we could get him to do what we

21   needed him to do whether it was coming to a family

22   holiday meal or wearing, you know, the right clothes to

23   graduation or just, you know, it was negotiation.

24       Q.    In one of the reports that Adam wrote, which

Caron Helfand

24

1    is Steiner Exhibit 3, Mr. Hardoon, he says, my parents

2    would bribe me to go a month without a suspension and

3    they would get me something like a bike and pretty big

4    stuff.  Is that true?

5        A.    That's true.

6        Q.    Is that what you mean when you refer to

7    negotiation?

8        A.    No, no

9        Q.    Explain.

10       A.    That was one part.  Negotiation was if it was

11   something we had to do, go to a holiday dinner at my

12   brother's or something and he didn't want to go, we

13   would sit down there and talk and talk and negotiate

14   until finally he would compromise and he would come or

15   he would say but I'm going to stay this long and we

16   would go okay.

17       Q.    Who is your brother?  What is his name?

18       A.    My brother Hal.  My older brother.

19       Q.    Do you have another brother?

20       A.    Marty.  So that would be the negotiation.

21   When he was in school, yes.  We did at one time bribe

22   him if he would, you know, do well in school and not

23   get -- we wouldn't get any phone calls that we would

24   buy him a bike he wanted.

Caron Helfand

25

1   Q.   That's not the motor bike.  That's a

2   different bike?

3   A.   No.  That was something else.  Right.

4   Q.   So he had a motor bike in junior high?

5   A.   I hope it was junior high.  I believe it was.

6   Q.   He writes -- I'm sorry.

7   A.   You know what?  I'm confused as to exactly

8   when the motor bike came.

9   Q.   Well, that's okay.  We can clear it up later

10  today or tomorrow.  It's not a problem.

11  A.   Okay.

12  Q.   Adam writes in his report with regard to the

13  bribing, quote, I knew I controlled my parents from

14  this point on.  Did you know he felt that way?

15  A.   No.

16  Q.   Can you remember anything else from -- Let me

17  just go back.  Have you learned at some point over the

18  years that that is how he felt, that is that he

19  controlled his parents?

20  A.   No.  I didn't learn that.  I don't recall

21  feeling that he -- I mean no.

22  Q.   Anything else you can recall from his junior

23  high school years by way of behavioral issues and then

24  I would also like you to tell me how he was doing in

Caron Helfand

29

1     Q.   He spoke with Adam.  Okay.  Now let me show

2     you a document which we will mark as the first exhibit.

3              (Exhibit No. 1 marked

4              for identification.)

5     Q.   Have you seen this document before?

6     A.   Yes.

7     Q.   This is a psychological test report from Dr.

8     Pinkwater; correct?

9     A.   Correct.

10     Q.   Reflecting that he tested Adam in August of

11     1995 when Adam was 13; is that true?

12     A.   Correct.

13     Q.   Now, when did you first see this document?

14     A.   I don't recall.  I guess when he sent it to

15     us.

16     Q.   So it would have been back at that time?

17     A.   Mm-mm.

18     Q.   And in this report Dr. Pinkwater indicates

19     that he came to see the psychologist because he made a

20     deal with you to give him several compact disks.  Do

21     you see that?

22     A.   Yes.

23     Q.   Is that true?

24     A.   That was true.

Caron Helfand

30

1      Q.    That would have been either a bribe or a

2  negotiation I suppose?

3      A.    Yes.

4      Q.    And did he see Dr. Pinkwater more than once

5  to your knowledge?

6      A.    More than once.

7      Q.    Yes?

8      A.    Yes.

9      Q.    At the end of the report Dr. Pinkwater

10 indicates that Adam would benefit from individual and

11 family counseling.  Did you follow that recommendation?

12     A.    Yes.

13     Q.    What did you do?

14     A.    We went back to Dr. Pinkwater.  Mitch and I

15 and Adam would go.  I don't recall how many times he

16 went but eventually Dr. Pinkwater said he wasn't

17 getting any benefit because Adam wasn't participating

18 and so Mitch and I just continued going when we, you

19 know, had issues.

20     Q.    How many times did you and your husband meet

21 with Dr. Pinkwater approximately?

22     A.    Over the years probably ten, 15 times.  I

23 don't know exactly.

24          MR. STEINFIELD:  Mr. Hardoon, I will

Caron Helfand

37

1              (Exhibit No. 2 marked

2              for identification.)

3        Q.    Have you seen this document before?

4        A.    I don't remember.  I mean it --

5        Q.    If you take a look at Page 38 at the top.

6    The number 38 is at the top.  You will see the number

7    three in a circle over on the top left.  Do you see

8    that?

9        A.    Yes.

10       Q.    You recognize this to be in Adam's

11   handwriting, do you?

12       A.    Yes.

13       Q.    Here he says in the third line, I shoplifted

14   a lot when I was in the seventh grade.  That's what I

15   would do for fun.  I got a kick out of it.  I taught

16   other people how to steal also.  It came in handy when

17   I needed cigarettes.  I stole anything I could even if

18   I didn't want or need it.  Do you recall having read

19   this previously?

20       A.    I don't recall reading this.

21       Q.    Were you aware before I just read those words

22   that he shoplifted a lot in seventh grade?

23       A.    No.  I really thought he shoplifted one time

24   and got caught and that he learned from that.  I did

Caron Helfand

38

1    not know.

2        Q.    You now know that not to be true?

3        A.    Correct.

4        Q.    Did you know he taught other people how to

5    steal?

6        A.    No.

7        Q.    Well, moving on from Dr. Pinkwater.  Did you

8    get help or try to get help for Adam from anybody else?

9        A.    Yes.  We talked to his school.  We talked to

10   his -- before he went to high school we made an

11   appointment.  We went in and talked to the school

12   counselor, his counselor at the high school he was

13   going to be attending.  We voiced our concerns but we

14   were always in contact with the school.  I mean that's

15   who we talked to.

16       Q.    When you say the school, Adam was at more

17   than one school.  Which one are you referring to?

18       A.    Field School which was his junior high and we

19   had a very good relationship there with the principal

20   and assistant principal and we talked to them and then

21   he went to Glenbrook South and his counselor there, I

22   don't recall her name but, you know, we talked to her

23   often and then I believe we had him tested in high

24   school at Glenbrook South so we had a meeting with the

Caron Helfand

42

1    episodes.

2        Q.    Well, if you look at the last page, Page 200,

3    the signature page of this document from James Mooney.

4        A.    Mm-mm, yes.

5        Q.    He makes some recommendations one of which

6    is, quote, the family should establish clear ground

7    rules for Adam at home where he has to earn the extra

8    benefits he seeks, i.e., driver's license, more

9    freedom, etc.  Did you agree with that recommendation?

10        A.    Yes.

11        Q.    Did you follow it?

12        A.    We tried to.  We tried to.

13        Q.    By that do you mean that you set rules and he

14    broke them?

15        A.    We set rules and they were broken some of

16    them.

17        Q.    What rules did he not break that you can

18    recall?  Can you think of a single rule you made that

19    he didn't break?

20        A.    If I told him he had to be home by 11

21    o'clock, he would be in that house at 1 o'clock.

22        Q.    Anything else?

23        A.    They didn't have cell phones then and if I

24    paged him, and I paged him a million times because I

Caron Helfand

43

1    was very anxious, he would find a phone and call me

2    back and so -- and he always came home.  He would let

3    me know where he was going.

4        Q.    So he had a pager?

5        A.    He had a pager.

6        Q.    How did he happen to have a pager?

7        A.    That's what we gave him.  Kids didn't have

8    cell phones so we gave them pagers and that way if we

9    needed to locate them, we paged them.

10        Q.    Did his friends have pagers?

11        A.    Everybody had pagers.

12        Q.    Did you learn at some point that he used his

13    pager to sell drugs?

14        A.    I learned later on, yes.

15        Q.    When you give a person a pager, do you get

16    charged by the use?

17        A.    I don't recall.  I didn't pay the bill.  I

18    don't know.

19            MR. STEINFIELD:  Let me mark as the next

20    document Forest Health System Outpatient Chemical

21    Dependency Programs.

22            (Exhibit No. 4 marked

23            for identification.)

24        Q.    Have you seen this document before,

Caron Helfand

47

1    A.    I'm his mother.

2    Q.    You love him.

3    A.    I love him.

4    Q.    Sure.

5    A.    But I also think that he was still

6    functioning in the family and trying in his own way.  I

7    mean he wasn't leaving.  He wasn't running away.  He

8    wasn't trying to get away from the family.

9    Q.    In the middle of the second page question.

10   Has the client's substance use or emotional disorder

11   interfered with family relations.  Answer from Adam,

12   quote, patient reports it did not interfere at all.

13   Patient stated they were bad even before I started

14   using, close quote.  Did you know he felt that way?

15   A.    I must have read it.

16   Q.    Did you know before you read it that that's

17   how he felt?

18   A.    No, I did not know that.

19   Q.    Now, let me ask you this, Mrs. Helfand.  Have

20   you had any treatment yourself for any emotional issue?

21   A.    I spoke to my doctor and got a prescription

22   for anxiety medication to take.

23   Q.    This is Dr. Berman?

24   A.    Yes.

1    Q.    This is the Xanax?

2    A.    Yes.

3    Q.    This is in 2004?

4    A.    Correct.

5    Q.    Other than that, in your adult lifetime have

6    you had any psychotherapy or any kind of medication?

7    A.    Just counseling.  No.  Just counseling with

8    Dr. Pinkwater.

9    Q.    The reason I ask is this.  If you take a look

10   at the top of this page of Exhibit 4, family members.

11   Do you see where it says mother?

12   A.    Mm-mm.

13   Q.    And over on the right under mental illness

14   yes and the word depression.

15   A.    Yes.

16   Q.    Apparently that's what Adam indicated.

17   A.    Right.

18   Q.    Was that true?

19   A.    No, this is not true.  I was never -- I mean

20   I would be depressed myself because of, you know, what

21   was going on with him.  I wanted him to be happy and

22   obviously he was not happy but, no.  I never spoke to a

23   doctor.  I was never diagnosed with depression.  I have

24   never taken any kind of medication other than this last

1    time that I spoke with Dr. Berman.

2        Q.    Well, any parent would be depressed or upset

3    when confronted with these problems.

4        A.    Right.

5        Q.    For sure.  And of course this reference here

6    on Page 231, the second page of Exhibit 4, suggests

7    that either Adam believed you were taking medication

8    for depression or he lied; right?

9              MR. HARDOON:  Objection.

10       A.    I don't know.  I don't know what he thought.

11       Q.    Take a look at the following line.  Patient

12   reports mother is on medication for depression.  Where

13   would he get that idea if you know?

14       A.    I don't know.  I mean I don't know.

15       Q.    Well, did you look at this document back when

16   it was prepared?

17       A.    I did, yes.

18       Q.    And at the time you read the report, did you

19   go to Adam and ask him where he got that idea?

20       A.    No, I didn't.  We were --

21       Q.    Did you talk with anybody about -- did you

22   contact the person who did this evaluation and say this

23   isn't accurate?

24       A.    No.

Caron Helfand

54

1    Q.    In the lengthy handwritten document which I

2    believe you have in front of you if you could look at

3    the page number 40 at the top.  That's just the Bates

4    stamp number in the case.  It is actually Page 5 of the

5    essay.  Do you see that?

6    A.    Yes.

7    Q.    In the middle of the page, quote, one of the

8    first times I actually got wasted was when I smoked

9    opium.  I went out to eat with a few friends and saw

10   some kids from school.  I was a freshman and had seen

11   them at school.  Were you aware before I just read that

12   to you that he smoked opium as a high school freshman?

13   A.    No.

14   Q.    When did you read this document?

15   A.    I haven't.

16   Q.    Ever?

17   A.    Not that I know, no.

18   Q.    Down on that same page, quote, I loved it.  I

19   made more great friends and soon my life became getting

20   stoned.  I spent all my money on drugs.  I even stole

21   from my parents and friends' houses to pay for it.  Is

22   this the first you have learned of that?

23   A.    Yes.

24   Q.    He has never told you face-to-face?

Caron Helfand

55

1     A.    No.

2     Q.    Are you surprised now to learn that back in

3  his high school days he was stealing money from you?

4     A.    I didn't know he was.

5     Q.    I understand that.  Are you surprised now to

6  learn that he did that?

7     A.    I don't know how to answer the question.

8     Q.    It is a hard question.  I don't fault you for

9  that.  You told me earlier about having a good

10  relationship with him when he was younger.

11     A.    Mm-mm.

12     Q.    About some of the difficulties that occurred

13  in junior high school.  How would you characterize your

14  relationship with your son Adam by the time he was a

15  freshman in high school?

16     A.    I knew he was doing things that were wrong.

17  I didn't know what they were.  I didn't trust him when

18  he left the house.  I would often follow him and I was

19  paging him constantly so he would check in if he was

20  not home but I did not know he was -- I thought he was

21  using marijuana.

22     Q.    And at that time did he have a part-time job?

23     A.    He worked and it might have been in junior

24  high.  He bagged groceries at The Jewel.  He worked at

Caron Helfand

84

1      Q.    Exhibit 5 consists of a June 4th letter to

2  the Helfands attached to which is a May 10, 1999

3  report.

4      A.    Right.  This was the start of it.  May 10th.

5  This was the verdict.

6      Q.    And a May 17th letter to the Helfands.

7      A.    Mm-mm.

8      Q.    An incident report with reference to Adam.

9      A.    Right.

10      Q.    And related documents all collectively marked

11  as this exhibit.  Now I understood you to say he was

12  suspended for stealing $140, but according to this, he

13  was suspended from school for possession of a

14  controlled substance and drug paraphernalia in May 1999

15  and that's my confusion.

16      A.    Okay.  Let me explain it to you.

17      Q.    Please.

18      A.    Okay.  It's probably me misunderstanding you.

19  He was -- we were called on May 4th to come pick him

20  up, that they found drug paraphernalia and residue or

21  whatever they found in his car and then we went through

22  a hearing so I look at that period of time as his

23  expulsion but he was really not in school.  So first I

24  guess you would say he was suspended but it ended up in

Caron Helfand

85

1    an expulsion because on May 4th he was suspended and

2    then they had a hearing for him and then on June 4th

3    they came out with a verdict.  It took them four weeks

4    to come out with a verdict on whether on expel him or

5    suspend him, keep him out of school.

6        Q.    And after that he didn't go back to Glenbrook

7    North?

8        A.    Right.  After May 4th he never went back to

9    Glenbrook North.

10        Q.    So where is the $140 ten-day suspension?

11        A.    That happened -- that was the suspension

12    early on in his Glenbrook North.

13        Q.    So there were two suspensions?

14        A.    Well, I call this an expulsion.  You're

15    calling it a suspension.

16        Q.    I understand.  He was suspended for ten days.

17    He went back and then he was expelled?

18        A.    Then he was expelled.

19        Q.    A few months later?

20        A.    Correct.

21        Q.    Only a few months?

22        A.    Only a few months.

23        Q.    He just got there in January.

24        A.    He just got there in January.

Caron Helfand

91

1    Q.    And how did Adam get his own car?

2    A.    We bought him a car.

3    Q.    When did you do that?

4    A.    I don't remember if it was right after he

5    turned 16 or a couple of months later.  I don't recall.

6    Q.    So when I asked you earlier about the use of

7    your car or your husband's car and you said he always

8    would ask.

9    A.    Mm-mm.

10   Q.    I failed to ask the right question

11   apparently.  At some point he had his own car?

12   A.    Yes.

13   Q.    So he didn't have to ask anybody whether he

14   could use that?

15   A.    Mm-mm.

16   Q.    Yes?

17   A.    Yes.

18   Q.    Did you buy it new or did you buy it used?

19   A.    It was a used car.

20   Q.    What kind of a used car?

21   A.    It was a black Trans Am.  No.  I don't know.

22   It was black, you know.  A Pontiac something.

23   Q.    Did you and your husband pay it?

24   A.    It was a Sunbird.  Yes, we paid for it.

Caron Helfand

92

1    Q.    How much?

2    A.    You would have to ask Mitch.  I don't recall.

3    Q.    And what was the reason for buying Adam a

4  car?

5    A.    It was usually there was a bribe with it, you

6  know, if you stay out of trouble, we'll buy you a car

7  and he would do that.

8    Q.    Would do what?

9    A.    He would stay out of trouble for a period of

10  time and we bought him the car then.

11    Q.    Well, it appears that you had on the one hand

12  the report from the school which looked incriminating.

13    A.    Mm-mm.

14    Q.    With regard to Adam and then on the other

15  hand, you had Adam denying it; is that true?

16            MR. HARDOON:  Objection.

17    A.    I don't remember if Adam was denying the

18  report but he was denying that there was marijuana

19  substance in the car.  They went in the car with

20  masking tape and went around like this and said there

21  was seeds of marijuana and that's why the expulsion

22  didn't come for a month later because they sent that

23  tape to get a police report on it.

24    Q.    So just to recap this, within five months

Caron Helfand

122

1        A.    Right and -- right.

2        Q.    Did he seek any kind of counseling or therapy

3    for himself?

4        A.    No.

5        Q.    And the reason?

6        A.    You would have to ask him.  I don't know.

7        Q.    That's a fair answer.  You say you didn't do

8    it because there was no time; correct?

9        A.    Mm-mm.

10        Q.    Correct?

11        A.    Yes.

12        Q.    Adam left home in the summer of '99 and went

13    to John Dewey Academy; have I got that right?

14        A.    In June.

15        Q.    In June.

16        A.    Yes.

17        Q.    And that's a residential program?

18        A.    Yes.

19        Q.    After he went to John Dewey Academy, did he

20    ever live full-time again up to the present at your

21    home?

22        A.    No.

23        Q.    Did you after he entered John Dewey Academy

24    seek any kind of counseling or therapy for yourself?

Caron Helfand

128

1    Q.   And my question is simply this.  Do you

2    believe that his experience at John Dewey Academy had

3    anything to do with his ability to attend and make it

4    through college?

5        A.   I think that I probably don't know the answer

6    to that question.

7        Q.   It's a belief question.

8        A.   I don't know.  I don't know if Adam just grew

9    up, if it was just a maturity thing or if it was John

10   Dewey.

11       Q.   Well, he entered John Dewey Academy in June

12   of '99; is that right?

13       A.   Correct.

14       Q.   And he graduated from John Dewey in August of

15   2001; is that correct?

16       A.   Right.

17       Q.   And he then went to Manhattanville from 2001

18   to 2002; correct?

19       A.   Yes.

20       Q.   His freshman year?

21       A.   Right.

22       Q.   And he made it through that year?

23       A.   Correct.

24       Q.   Did he do okay?

137

1    has remained good ever since?

2        A.    Yes.

3        Q.    Through all of these problems he somehow was

4    able to talk to her?

5        A.    Yes, but she wasn't -- I mean she wasn't

6    around, she didn't live in Chicago, for all these

7    problems so I'm sure there is a lot of things she

8    wasn't even aware of.

9        Q.    You didn't go out of your way or your husband

10   to share all the dirty laundry?

11       A.    No.

12       Q.    And her husband did your son do you know

13   confide in him as well or was it just the aunt?

14       A.    He did confide in Tom.  Not at the same time

15   but later I guess when Tom woke up in the morning but

16   it was during -- him and Holly stayed up I think all

17   night long.  Then when Tom was up, they discussed it.

18   If I remember, that's how it happened.

19       Q.    How long if you know was it between the time

20   Adam told his aunt what had been going on and the time

21   the aunt told you?

22       A.    Adam confessed to Holly in the summer and

23   Holly called us up in January.

24       Q.    Let me get this straight.  In the summer of

Caron Helfand

138

1   2002 and in January 2003; have I got that right?

2        A.    Right.

3        Q.    I have just a small piece of unfinished

4   business here.  Exhibit 10 which we marked before is a

5   typewritten copy of Exhibit 9, the letter of

6   appreciation.  My first question is who signed this

7   letter?

8        A.    Mitch.

9        Q.    Can you explain to me why there were two

10  versions of the same letter, one handwritten and one

11  typed?

12       A.    I don't know that we sent the handwritten

13  one.  Maybe Mitch typed it up and sent it.  I don't

14  know.  I don't know.  I mean we only sent one.  I don't

15  recall which one was sent.  I want to say Mitch typed

16  it up and then I rewrote it on a note card.

17       Q.    But it's not the same.  For example on your

18  version, Exhibit 9, you conclude our heartfelt thanks.

19  Caron and Mitch.

20       A.    Mm-mm.

21       Q.    On Exhibit 10 sincerely, Mitch.  So you don't

22  know whether they both sent were or not, do you?

23       A.    My feeling is, and I'm not completely sure,

24  is that Mitch typed this up and then when I rewrote it,

Caron Helfand

139

1    I changed sincerely to our heartfelt thanks.

2        Q.   So you believe that it is the handwritten

3    version that got sent out?

4        A.   I think.

5        Q.   All right.  I thought you told me before that

6    you drafted the letter.

7        A.   I think we worked on it together.  I mean

8    Mitch sits at the computer and he'll type it and I'll

9    often say, you know, what I think he should say because

10   sometimes he is too straightforward and I wanted to put

11   some emotion in it.

12       Q.   Well, you say, quote, there aren't words that

13   would adequately express our gratitude.  Adam's success

14   with his first year at college and his being appointed

15   RA are profoundly attributable to your great work and

16   your genuine caring for the well-being of your

17   students.  Did you believe those words when you wrote

18   them?

19       A.   When I wrote them, I did.

20       Q.   Allowing Adam to come back and be part of

21   your lives and part of your home has meant a great deal

22   to him and us.  Please know that you can call on us any

23   time to help you or any JDA families coming to Chicago.

24   You were sincere when you wrote that?

Caron Helfand

140

1    A.   I was.

2    Q.   Now as you sit here today, Mrs. Helfand, do

3  you know, I'm not asking what you believe, do you know

4  whether Tom Bratter was aware of this sexual

5  relationship prior to sometime in the year 2003?

6    A.   I can't answer that.  I don't know what Tom

7  Bratter would know.

8    Q.   The same question with regard to Carole

9  Bratter.

10    A.   I don't know for sure what they know or don't

11  know but I would assume that they would have seen

12  things.

13    Q.   That's your best answer?

14    A.   Yes.

15    Q.   The same question with regard to Ken Steiner.

16  You don't know, do you?

17    A.   No.

18    Q.   Now returning to the summer of 2002.  The

19  child -- do you know the child's name?

20    A.   No.

21    Q.   I believe it's Vanessa.

22    A.   I think I have heard that.

23    Q.   The child was born on or about June 15th of

24  that year; correct?

1          A.    I believe so.

2          Q.    And you say that your sister-in-law found out

3   about this in the summer of that year?

4          A.    Right.

5          Q.    And informed you approximately five or six

6   months later?

7          A.    Right.

8          Q.    Do you know why she waited that long?

9          A.    Yes.

10          Q.    Tell me.

11          A.    She wanted Adam to come forward on his own.

12          Q.    He never did?

13          A.    No.

14          Q.    She is the one who told you why she waited?

15          A.    Yes.

16          Q.    What did you say to her when she told you

17   that?

18          A.    I was in such shock over what she had told me

19   I don't know what I said to her.

20          Q.    Were you upset when you learned that she had

21   known this for six months or nearly six months and

22   hadn't told you?

23          A.    At the time I didn't think about the length

24   of time.  I was just blown away by what she had told

Caron Helfand

142

1  us.

2      Q.    Now have you had any e-mail correspondence

3  with her on the subject of this sexual relationship and

4  pregnancy?

5      A.    I wouldn't have e-mails with her.  I have

6  talked on the phone.

7      Q.    Many times?

8      A.    Many times.

9      Q.    And Adam moved out to San Diego in the spring

10  of this year; is that true?

11      A.    Yes, in May.

12      Q.    And what did he do when he got there?

13      A.    He found a place to live.  Well, I mean he

14  moved into a place to live now and he got a job and he

15  was waiting to start school.

16      Q.    How do you know those things?

17      A.    Well, we were there in August and plus we

18  know from Holly what is going on.

19      Q.    Not from Adam?

20      A.    Well, we talk to Adam but we knew it from

21  Holly, too.

22      Q.    Did he start school?

23      A.    He did.

24      Q.    What school?  Chapman?

Caron Helfand

160

1                    P R O C E E D I N G S

2                    CARON HELFAND, having previously duly

3    affirmed that her testimony would be the truth, the

4    whole truth and nothing but the truth, testified as

5    follows in answer to continued interrogatories by MR.

6    STEINFIELD:

7         Q.    Good morning, Mrs. Helfand.

8         A.    Good morning.

9         Q.    You remain under oath.

10        A.    Yes.

11        Q.    And this is the resumption of the deposition

12   of Caron Helfand at the conclusion of which we will

13   turn to the deposition of Mitchell.  Now, Mrs. Helfand,

14   in a discussion that we have just had here off the

15   record your attorney clarified some information with

16   regard to Dr. Berman and you were here; right?

17        A.    Yes.

18        Q.    And perhaps you could just explain to me

19   first of all who is Dr. Berman?

20        A.    He is my gynecologist.

21        Q.    And in your answers to interrogatories you

22   refer to the fact that you have incurred expenses for

23   medical treatment for anxiety.  That's answer number

24   15.  Is that an accurate response?

Caron Helfand

161

1    A.    Well, yes.  He gave me pills for my anxiety.

2    Q.    Dr. Berman?

3    A.    Dr. Berman.

4    Q.    And in the following interrogatory I asked

5    you to list any doctors, therapists and so forth whom

6    you consulted in connection with any emotional distress

7    that you contend was based on the acts in this case and

8    you identified Dr. Berman?

9    A.    Correct.

10   Q.    Now, have you at any time since learning of

11   your son's sexual relationship with Gwen Hampton

12   obtained any counseling?

13   A.    No.

14   Q.    Have you felt the need to obtain such

15   treatment?

16   A.    Sometimes.

17   Q.    You and your husband have some sort of

18   medical insurance I understand?

19   A.    Correct.

20   Q.    Is that Blue Cross?

21   A.    Correct.

22   Q.    And you understand that that provides you

23   with a certain amount of coverage for counseling?

24   A.    Correct.

Caron Helfand

162

1     Q.   Is it fair to say that you have not utilized

2   the insurance benefits available to you for purposes of

3   obtaining counseling?

4     A.   Correct.

5     Q.   And the same is true to your knowledge of

6   your husband?

7     A.   Correct.

8     Q.   Well, if you have from time to time thought

9   it might be helpful, I would like you to explain to

10  me --

11    A.   Sure.

12    Q.   -- why you have apparently decided not to

13  obtain such treatment.

14    A.   Right.  Well, how do you trust after what

15  Adam went through?  How do you find a doctor that you

16  can trust?  I mean Dr. Berman delivered Adam.  I have

17  known him for years and I trusted him.  I don't know

18  how to find a doctor after what happened with our

19  situation at John Dewey that I would trust.  I have a

20  very hard time trusting.

21    Q.   Well, you would trust Dr. Berman's advice

22  apparently?

23    A.   Yes.

24    Q.   Did you ask Dr. Berman to recommend a good

Caron Helfand

163

1    person to give you counseling or therapy?

2        A.    I did not ask him.

3        Q.    Is that because you would not trust his

4    recommendation?

5        A.    I don't know that I could trust a

6    psychologist or a psychiatrist.

7        Q.    Do you know any psychologists or

8    psychiatrists?

9        A.    I know a psychologist.

10       Q.    Socially?

11       A.    No.

12       Q.    Do you know any social workers?

13       A.    No.

14       Q.    Do you belong to a temple?

15       A.    No.

16       Q.    Have you in the past?

17       A.    Yes.

18       Q.    Do you know a rabbi?

19       A.    Not anymore, no.

20       Q.    Do you go to the synagogue on the holidays?

21       A.    We used to.  This year we did not.

22       Q.    So when you say you used to know a rabbi, is

23   that before --

24       A.    We didn't know a rabbi.  We went to services.

Caron Helfand

213

1    interrogatory number eight.  Do you see that?

2        A.    Yes.

3        Q.    B asks you to identify the date on which you

4    first became unable or less able to enjoy the activity

5    with Adam Helfand referring back to the contention in

6    the complaint.  Do you see that?

7        A.    Yes.

8        Q.    And if you go to the next page or to the

9    bottom of the page then going over to the next page,

10   the last part of your answer says, the relationship

11   completely unraveled upon Adam's disclosure to us in

12   March 2003.

13       A.    Correct.

14       Q.    Of the abuse by defendant Hampton and the

15   birth of their child.  Is that answer accurate?

16       A.    Correct.

17       Q.    I thought you told me that Adam didn't tell

18   you, that it was Holly.

19       A.    Holly told us in January but Adam -- we met

20   Adam in California in March.  He didn't know we knew

21   until we met him.  We felt we needed to be with him

22   physically.  We didn't want to call him on the phone at

23   Manhattanville so we made arrangements on his spring

24   vacation to meet him in California.