```
                                                        1
 1                                          Volume:  I

 2                                          Pages:   1-120

 3                                          Exhibits: 1-4

 4

 5              UNITED STATES DISTRICT COURT

 6              DISTRICT OF MASSACHUSETTS

 7  Civil Action No. 04-11800-DPW

 8  - - - - - - - - - - - - - - - - - - x

 9  ADAM HELFAND, CARON HELFAND and

10  MITCHELL HELFAND,

11                  Plaintiffs,

12  vs.

13  THE JOHN DEWEY ACADEMY, INC., THOMAS

14  BRATTER, CAROLE BRATTER, KEN STEINER

15  and GWENDOLYN HAMPTON,

16                  Defendants.

17  - - - - - - - - - - - - - - - - - - x

18           DEPOSITION OF MITCHELL HELFAND

19              Tuesday, November 8, 2005

20            Prince Lobel Glovsky & Tye, LLP

21                585 Commercial Street

22             Boston, Massachusetts 02109

23               Commencing at 1:46 p.m.

24       Reporter:  Karen A. Morgan, CSR/RPR
```

Mitchell Helfand

4

1           P R O C E E D I N G S

2           MR. STEINFIELD:  Same stipulations.

3           MR. HARDOON:  Same stipulations.

4           MITCHELL HELFAND, having duly affirmed that

5  his testimony would be the truth, the whole truth and

6  nothing but the truth, testified as follows in answer

7  to interrogatories by MR. STEINFIELD:

8       Q.    What is your name?

9       A.    Mitchell Helfand.

10      Q.    Your address?

11      A.    2544 Buckland Lane, Northbrook, Illinois

12  60062.

13      Q.    You are the husband of Caron and the father

14  of Brad and Adam; is that right?

15      A.    Yes.

16      Q.    And a plaintiff in this case?

17      A.    Yes.

18      Q.    What is your date of birth?

19      A.    August 13, 1952.

20      Q.    What is your occupation?

21      A.    Finance executive.

22      Q.    For whom are you employed?

23      A.    Employed by the Blue Cross and Blue Shield

24  Association.

35

1  if he is not going to be cooperative with professional
2  counseling, then it's probably a waste of time to
3  pursue that avenue of direction.
4     Q.   So it was Dr. Pinkwater who essentially
5  advised you to let Adam decide whether or not Adam
6  should have therapy; is that correct?
7     A.   Yes.  I guess, yes.
8     Q.   And what advice if any did you personally try
9  and get to help you cope with this difficult child?
10    A.   Dr. Pinkwater and the school professionals
11 were our main sources of advice and then later Forest
12 Hospital obviously and John Dewey.
13    Q.   As I understand it from your answers to
14 interrogatories, you have not personally obtained any
15 kind of therapy to help you cope; is that true?
16    A.   Yes.
17    Q.   Is that because you haven't felt the need to
18 do so?
19    A.   Yes.
20    Q.   You felt able to handle it on your own?
21    A.   With Caron's support, yes.  I rely a lot on
22 Caron and our joint relationship to help.
23    Q.   Now your other son Brad, how would you
24 characterize his relationship with Adam?

Mitchell Helfand

40

1        A.    Yes.
2        Q.    What was the name of that school?
3        A.    The Hidden Lake Academy.
4        Q.    Now, why did you pick John Dewey instead of
5   Hidden Lake?
6        A.    One important factor was the staff to student
7   ratio. At the time John Dewey had a staff to student
8   ratio of either two to one or less than two to one.
9   Hidden Lake Academy had a staff to student ratio which
10  was about ten to one. I thought that the credentials
11  of the people at John Dewey as they were explained to
12  me, the staff in general was much more highly
13  credentialed than the staff at Hidden Lake Academy. I
14  liked the philosophy of John Dewey as far as placing
15  its students in a college as being one of the important
16  factors of their program and that was a meaningful
17  factor to me and those were the distinguishing factors
18  that I recall at the time.
19       Q.    Did you know that at John Dewey students were
20  not under lock and key?
21       A.    Yes.
22       Q.    Was the same true at Hidden Lake?
23       A.    Yes.
24       Q.    Were you aware of the fact that there were

JONES REPORTING COMPANY
617-451-8900

Mitchell Helfand

41

1  schools which essentially did have the students
2  restricted from moving about freely?
3      A.   Yes.
4      Q.   Did you consider such a place for Adam?
5      A.   No.
6      Q.   Now your wife has testified that she was very
7  concerned about Adam, paged him frequently, followed
8  him, basically didn't trust him back when he was living
9  at home; right?
10     A.   Yes.
11     Q.   So is it fair to say that at the time you
12 placed Adam in John Dewey Academy, you and your wife
13 both considered him to be untrustworthy?
14     A.   No.
15     Q.   You trusted him?
16     A.   He was very compliant.  There's a difference
17 between being compliant and trustworthy.  We didn't
18 trust him but he was highly compliant.  Any time we
19 would page him, he would phone home.  When we followed
20 him to where he said he was going, we didn't catch him
21 not going where he said he was going.  So he was a very
22 compliant kid and felt that he didn't need a lock down
23 plus the advice of the educational consultant was in
24 light of her assessment he didn't need a lock down

Mitchell Helfand

54

1    A.    From his perspective I suppose that's what he
2  thought.
3    Q.    Did you feel manipulated by your son?  Take
4  your time.  That's not an easy question.
5    A.    No, I didn't.
6    Q.    Do you know whether your wife did?
7    A.    I don't know.
8    Q.    So you felt that you were in control of the
9  situation with him?
10   A.    No.
11   Q.    Did you feel you were not in control of the
12 situation?
13   A.    At times.
14         MR. STEINFIELD:  Let me mark this document
15 as the next exhibit.
16         (Exhibit No. 2 marked
17          for identification.)
18   Q.    Exhibit 2 is a document with the words
19 Release John Dewey Academy at the top.  Is this your
20 signature?
21   A.    Yes.
22   Q.    Did you read this document before you signed
23 it?
24   A.    Yes.

55

1  Q.  And did you understand what you were signing?
2  A.  Yes.
3  Q.  What did you understand you were signing?
4  A.  It was a document that would acknowledge the
5  fact that I understood the terms of his admission to
6  John Dewey.
7  Q.  And specifically, you agreed that John Dewey
8  Academy would be released from all liability or
9  responsibility for anything that happened while Adam
10 was there, didn't you?
11          MR. HARDOON:  Objection.
12 Q.  Just read that first paragraph to yourself.
13 A.  That's what it says.
14 Q.  And at the time you signed the document, you
15 knew that that is what it said; right?
16 A.  I read it, yes.
17 Q.  Did you tell anyone at John Dewey Academy
18 that although you were signing the document you really
19 didn't mean it?
20 A.  No.
21 Q.  Have you ever told anyone at John Dewey
22 Academy that you didn't really mean what you signed
23 here?
24 A.  No.

1  Q.  And she did?

2  A.  Yes.

3  Q.  Now between January when she first called you
4  and March when you and your wife went out there, did
5  you talk to your sister about what you would do when
6  you got there?

7  A.  Yes.

8  Q.  What did you and she discuss?

9  A.  We discussed that there were two kinds of key
10 objectives of the trip. One was to provide Adam with
11 an interview at the University of San Diego and see if
12 we could accomplish that and the other one was to have
13 a conversation with Adam and let him know that we knew
14 about the situation with Gwen.

15 Q.  And it was an important event in your
16 family's life to have a conversation with your son
17 face-to-face; right?

18 A.  Yes.

19 Q.  I'll ask you again why you chose to exclude
20 your wife from that conversation. You don't have any
21 reason, do you?

22 A.  I don't have a direct reason at this point
23 other than the setting, the circumstances.

24 Q.  Well, those are just words, sir. You have to

Mitchell Helfand

95

1  explain what you mean.
2          MR. HARDOON: Objection.
3      Q.  Did you have a conversation with Adam in the
4  car?
5      A.  No.
6      Q.  Where was the conversation among him, you and
7  Holly?
8      A.  It was at a restaurant.
9      Q.  So you picked him up at the train station.
10 You went to a restaurant?
11     A.  Right.
12     Q.  And you sat down and you spent an hour or two
13 there?
14     A.  No. It was maybe 20 minutes.
15     Q.  Fast food restaurant?
16     A.  Yes.
17     Q.  And during that 20 minutes what did you say
18 to Adam and what did Holly say and what did he say in
19 much as detail as you can recall.
20     A.  The three of us were -- I think we -- it was
21 a carry-out type of place. We put in our order. We
22 grabbed a table and told him just flat out bluntly that
23 we knew about what was going on with Gwen and that we
24 were there to support him and I believe I told him that

96

1  I did not believe that it was his fault and felt bad
2  that he was placed in a situation that allowed that
3  type of conduct to emerge and we would work together to
4  support one another through the issue and that was the
5  extent of the conversation.
6      Q.   Had you consulted with anyone other than your
7  wife and your sister about what you would say?
8      A.   No.
9      Q.   Had you consulted with your wife?
10     A.   Yes.
11     Q.   And with your sister?
12     A.   Yes.
13     Q.   What did Adam say in response to your
14 sympathetic statement of support and that you didn't
15 hold him at fault?
16     A.   He didn't say much.  I asked him specifically
17 if he wanted to talk about the event and have
18 discussions about it and he indicated it was his desire
19 that he not talk to us about the specifics and the
20 details of it but was grateful for the gestures of
21 support.
22     Q.   This was at the fast food restaurant?
23     A.   Yes.
24     Q.   What did Holly say?

Mitchell Helfand

97

1  A.  I think she basically told him that she told
2  him that she wanted him to tell us but she told him
3  that she couldn't wait any longer and decided that
4  since he wasn't doing it, that she would tell us and
5  basically explained to him that that was how we found
6  out.
7  Q.  So she told you in January but she didn't
8  tell Adam that she had told you?
9  A.  No.
10  Q.  You're sure of that?
11  A.  I'm not sure but I don't believe she did.
12  Q.  Well, when you told Adam at the restaurant
13  that you knew about this.
14  A.  Right.
15  Q.  Was he upset that you knew about it?
16  A.  No.  Didn't show any significant type of
17  emotion one way or the other.
18  Q.  Did he give you any reason or explanation for
19  not having told you himself?
20  A.  No.
21  Q.  And did you leave the restaurant and then go
22  back to meet your wife?
23  A.  Yes.
24  Q.  At the beach or the hotel?